IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COX OPERATING, L.L.C., | § | |
| | § | |
|   Plaintiff, | § | |
| | § | CIVIL ACTION NO. H-07-2724 |
| v. | § | (Consolidated with |
| | § | CIVIL ACTION NO. H-08-1382) |
| ST. PAUL SURPLUS LINES | § | |
| INSURANCE COMPANY, | § | |
| | § | |
|   Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are: 1) Defendant St. Paul Surplus Lines Insurance Company's ("St. Paul") Motion for Partial Summary Judgment on Repair of Flowlines ("Flowlines Motion") (Doc. 292); and 2) St. Paul's Motion for Partial Summary Judgment on Removal of Wreck Coverage ("Wreck Removal Motion") (Doc. 293).[2]

The court has considered the motions, all relevant filings, and the applicable law and **RECOMMENDS** that the motions concerning flowline repair and wreck removal be **GRANTED IN PART AND DENIED IN PART**.

## I.  Case Background

This insurance case centers on the obligation of St. Paul, the issuer of primary and umbrella excess insurance policies covering

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Docket Entry No. 75.

[2]     Also pending is Cox's Motion for Partial Summary Judgment (Doc. 294) and St. Paul's Motion for Partial Summary Judgment on Breach of Cooperation Clause (Doc. 295).  The court addresses these remaining motions in separate memoranda.

oil and gas commercial general liability, to pay Cox Operating, L.L.C.'s ("Cox") loss claims related to pollution cleanup following Hurricane Katrina.

## A. __Factual History__[3]

For the period June 1, 2005, to June 1, 2006, St. Paul issued Cox a primary policy that covered oil and gas commercial general liability ("Primary Policy"), including coverage for pollution cleanup, up to a per-occurrence limit of $1 million.[4] Additionally, St. Paul issued an umbrella excess policy ("Excess Policy") for the same time period that also covered pollution cleanup up to a policy limit of $20 million with a $10,000 deductible.[5]

In the Primary Policy, St. Paul agreed to cover pollution clean-up costs as follows:

> **Pollution clean-up costs.** We'll pay amounts you voluntarily incur, or you're legally required to pay, for covered pollution clean-up costs that result from a sudden and accidental pollution incident which:
>
> • begins while this agreement is in effect;
>
> • results from your work or your completed work in the performance of your oil or gas operations,

---

[3]    The uncited portions of this background section are derived from the fact sections of prior opinions.

[4]    See Doc. 292-8, Ex. 8 to St. Paul's Flowlines Mot., Oil & Gas Commercial Gen. Liab. Policy ("Primary Policy"), pp. COX 02328, COX 02333.

[5]    See Doc. 292-9, Ex. 9 to St. Paul's Flowlines Mot., Oil & Gas Umbrella Excess Liab. Policy ("Excess Policy"), pp. COX 02415, COX 02416, COX 02419.

other than such work or completed work that is or
was performed at, on, in, or from a waste site; and

- doesn't result from any intentional and willful
violation of any governmental law, regulation, or
rule by you or anyone acting on your behalf.[6]

The Excess Policy covered the pollution clean-up costs for which
Cox was legally required to pay and which would have been covered
by the Primary Policy if not for the exhaustion of its limit of
liability.[7]

Both polices defined "pollution clean-up costs" as those costs
or expenses for pollution work that were reported within the
prescribed policy time limit.[8]  The definition of "pollution work"
was also the same in both policies:

- the testing for, monitoring, cleaning up, removing,
containing, treating, detoxifying, or neutralizing
of any pollutant; or

- the responding to, or assessing, in any way the
effects of any pollutant.[9]

---

[6]    Doc. 292-8, Ex. 8 to St. Paul's Flowlines Mot., Primary Policy, p.
COX 02333.  The Primary Policy excepted from coverage, inter alia, expenses
voluntarily incurred for any part of the pollution work that was unnecessary or
unreasonable and expenses incurred for any improvement to Cox's property.  See
id.

[7]    See Doc. 292-9, Ex. 9 to St. Paul's Flowlines Mot., Excess Policy,
p. COX 02419.

[8]    Doc. 292-8, Ex. 8 to St. Paul's Flowlines Mot., Primary Policy, p.
COX 02333; Doc. 292-9, Ex. 9 to St. Paul's Flowlines Mot., Excess Policy, p. COX
02419.

[9]    Doc. 292-8, Ex. 8 to St. Paul's Flowlines Mot., Primary Policy, p.
COX 02333; Doc. 292-9, Ex. 9 to St. Paul's Flowlines Mot., Excess Policy, p. COX
02419.

The Primary Policy defined a "sudden and accidental pollution incident" as "the discharge, dispersal, escape, or release of a pollutant that . . . is sudden and accidental" (among other conditions).[10]  "Sudden" meant "abrupt and immediate," and "accidental" meant unexpected and unintended.[11]  The policies each contained an exclusion precluding coverage of property damage to property owned by Cox.[12]

Cox operated oil wells and related facilities in the waters of Louisiana.  Hurricane Katrina made landfall on August 29, 2005, passing directly over Cox's fields and destroying many of the oil wells, facilities, and equipment.  Among the items damaged were flowlines, which are internal field pipelines that transport hydrocarbons from a well to vessels and platform equipment.[13]  In the aftermath of Hurricane Katrina, federal and state environmental regulatory agencies oversaw the pollution cleanup at Cox's facilities.

Cox reported the damage to St. Paul, claiming covered losses at Quarantine Bay and Eloi Bay.  In total, Cox is claiming nearly

---

[10]     Doc. 292-8, Ex. 8 to St. Paul's Flowlines Mot., Primary Policy, p. COX 02334.

[11]     Id.

[12]     See Doc. 292-8, Ex. 8 to St. Paul's Flowlines Mot., Primary Policy, p. COX 02350; Doc. 292-9, Ex. 9 to St. Paul's Flowlines Mot., Excess Policy, p. COX 02436.

[13]     This fact is undisputed.  See Doc. 292, St. Paul's Flowlines Mot., p. 2; Doc. 319, Cox's Resp. to St. Paul's Flowlines & Wreck Removal Mots., p. 12.

$14 million, and St. Paul has reimbursed Cox a total of just over $1.48 million.

**B.   Procedural History**

St. Paul filed this declaratory action in this court on August 23, 2007, seeking a declaration that Cox's outstanding claims are not pollution clean-up costs covered by the excess insurance policy.  Cox filed a separate action, claiming breach of contract and other statutory damages, in the Eastern District of Louisiana on August 27, 2007.  Five months after denying Cox's motion to dismiss or, alternatively, to transfer venue in December 2007, the court consolidated the later-filed case with this one.  The case has been plagued by discovery disputes, multiple rounds of dispositive motions, amendments to the pleadings, and many party-initiated delays.

In the summer of 2009, the court addressed two motions for summary judgment.[14]  The first of these motions concerned the control-of-property exclusion, which the court interpreted to exclude coverage for property damage to property owned by Cox.[15]  The court did not go so far as to find that the exclusion necessarily negated all coverage "for pollution work that

---

[14]    See Doc. 187, Mem. & Recommendation Dated June 16, 2009; Doc. 200, Order Dated July 1, 2009; Doc. 201, Mem. & Recommendation Dated July 2, 2009; Doc. 216, Order Dated Aug. 19, 2009.

[15]    See Doc. 187, Mem. & Recommendation Dated June 16, 2009, p. 13.

5

involve[d] Cox's property as a source of pollution."[16]   The court
also left the determination of whether the invoices reflect costs
for property damage or pollution work to the jury at trial.[17]   The
second motion concerned the one-year reporting requirement,
specifically, whether it should be calculated on an invoice-by-
invoice basis.[18]   The court rejected that method of calculation but
found it "premature to set a definitive ending date or define a
means by which the ending date can be calculated."[19]

Since that time, the court granted St. Paul leave, over Cox's
objections, to amend its affirmative pleading.[20]   St. Paul amended
to add causes of action based on its allegation that Cox withheld
and/or concealed pertinent claim information and documents.[21]   The
court then realigned the parties upon Cox's motion.[22]   After another
year of litigation during which the parties filed numerous joint
motions for extensions of time, the parties filed the four pending
motions in March 2011.   Cox submitted a 137-page, single-spaced

---

[16]      Doc. 200, Order Dated July 1, 2011, p. 1.

[17]      Doc. 187, Mem. & Recommendation Dated June 16, 2009, p. 13.

[18]      See Doc. 201, Mem. & Recommendation Dated July 2, 2009, pp. 4-5; Doc.
216, Order Dated Aug. 19, 2009, p. 5.

[19]      Doc. 216, Order Dated Aug. 19, 2009, pp. 5-6.

[20]      See Doc. 247, Order Dated Jan. 27, 2010.

[21]      See Doc. 229, St. Paul's Am. Mot. for Leave to Amend; Doc. 248, St.
Paul's 1st Am. Compl.

[22]      See Doc. 197, Cox's Mot. to Realign the Parties; Doc. 265, Order
Dated Mar. 26, 2010.

declaration and attached a 118-page summary of the items Cox is claiming as clean-up costs.   The summary is supported by documentation on a digitally stored 24,000-page appendix.

Upon review of the motions, the parties requested a stay of all proceedings to allow them time to assess whether they might be able to reach agreements on the issues raised in the motions.[23]  The parties intimated in the motion to stay that St. Paul might reconsider adjustment of Cox's claim based on the declaration and supporting documentation and that Cox would make necessary witnesses available to St. Paul for additional information.[24]  They sought forty-five days to review the materials and discuss possible resolutions before responding to the pending motions.[25]

The court granted the motion.[26]  At a hearing in April 2011, the parties represented that they had agreed to have St. Paul's adjuster look at the declaration and supporting documentation submitted by Cox and to offer his impression by the end of April.[27]  At that time, the parties told the court, they would determine whether the case could be settled through mediation; or, at the very least, the parties would narrow the issues for the court's

---

[23]   See Doc. 299, Joint Mot. to Temporarily Stay Proceedings & to Extend Deadline to Respond to Mots. for Summ. J.

[24]   See id. at pp. 3-4.

[25]   See id. at pp. 4-5.

[26]   Doc. 300, Order Dated Mar. 28, 2011.

[27]   See Recording of Hearing Dated Apr. 8, 2011.

consideration.[28]   The court notified the parties that it was inclined to appoint a special master to make invoice-by-invoice coverage decisions should the parties be unable to reach agreements on their own.[29]  The court ordered the parties to report back to the court by May 9, 2011.[30]

Following a brief extension of time, the parties filed a Joint Status Report in which they indicated that they had conferred numerous times but were unable to resolve any issue presented to the court by summary judgment.[31]   The parties requested time to respond and to reply to the pending motions and suggested that the court defer any decision about the appointment of a special master until the parties had an opportunity to address the court.[32]

After several more extensions of time and orders granting the parties leave to exceed page limits and to file documentation in digital format, the parties completed briefing the pending summary judgment motions on August 9, 2011.[33]  The court now addresses two

---

[28]    See id.

[29]    See id.

[30]    See id.

[31]    See Doc. 305, Order Dated May 12, 2011; Doc. 307, Joint Status Report, p. 2.

[32]    See id.

[33]    See Doc. 310, Order Dated June 28, 2011; Doc. 312, Order Dated July 12, 2011; Doc. 315, Order Dated July 15, 2011; Doc. 316, Order Dated July 15, 2011; Doc. 322, Order Dated July 26, 2011; Doc. 324, Order Dated August 3, 2011; Doc. 330, Order Dated Aug. 10, 2011.

of St. Paul's motions for partial summary judgment on policy interpretation.

## II.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).

A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

## III.   Analysis

St. Paul moves for partial summary judgment on two grounds related to policy interpretation: 1) the insurance policies do not cover expenses related to the repair of Cox's flowlines; and 2) the insurance policies do not cover expenses related to the removal of wreckage and debris from the water.

A.  **Applicable Principles of Insurance Law**

Under Texas law,[34] the insured generally bears the initial burden of establishing that there is coverage under an applicable insurance policy, while it is the insurer's burden to prove the applicability of an exclusion permitting it to deny coverage.  See Lincoln Gen. Ins. Co. v. Reyna, 401 F.3d 347, 350 (5th Cir. 2005)(applying Texas law and discussing duty to defend); see also Tex. Ins. Code § 554.002 (placing the burden on the insurer to prove the applicability of a coverage exclusion).  If the insurer is successful, the burden shifts back to the insured to prove that an exception to the exclusion applies.  Guar. Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 193 (5th Cir. 1998)(applying Texas law and discussing duty to defend).

Insurance policies are subject to the rules of contract interpretation.  Progressive Cnty. Mut. Ins. Co. v. Sink, 107 S.W.3d 547, 551 (Tex. 2003).  In construing the terms of a written contract, the court's primary purpose is always to "ascertain the

---

[34]   The court previously determined that Texas law applies to this action.  See Doc. 28, Mem. Op. & Order Dated Dec. 6, 2007, p. 8 (citing Texas Insurance Code § 21.42).

true intent of the parties as expressed in the instrument." <u>Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus.</u>, 907 S.W.2d 517, 520 (Tex. 1995).  To this end, the court reads all provisions within the contract as a whole and gives effect to each term so that no part of the agreement is left without meaning.  <u>MCI Telecomms. Corp v. Tex. Utils. Elec. Co.</u>, 995 S.W.2d 647, 652 (Tex. 1999).  Terms in contracts are given their plain, ordinary, and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning. <u>Bituminous Cas. Corp. v. Maxey</u>, 110 S.W.3d 203, 208-09 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

**B.   <u>Repair of Flowlines and Wreck Removal</u>**

St. Paul argues that expenses related to the repair of the flowlines and to the removal of wreckage and debris are not covered under the insurance policies and that the former category is specifically excluded from coverage.[35]  Cox argues that St. Paul did not specifically request declaratory relief on either issue and that, absent definitions of "repair of flowlines" and "removal of

---

[35]      As a lengthy aside, St. Paul raises the existence of separate insurance policies maintained by Cox that St. Paul contends covered the repair of the flowlines and wreck removal.  This court's only concern is whether St. Paul's policies covered the expenses claimed, not whether any other policy did. St. Paul is not making an argument under an "other insurance" provision. Rather, it is offering its opinions about the coverage provided by other Cox policies and its theory that Cox was underinsured for the type of damage suffered, motivating Cox to recast the flowline repair and wreck removal as pollution cleanup costs. Because the court is only concerned with the coverage of the policies at issue in this case, the court finds no reason to discuss St. Paul's extraneous theories.  It also is not relevant, contrary to St. Paul's suggestion, what claims Brammer Engineering thought were covered by which insurance policies.

wreckage or debris," any decision by the court on coverage of related expenses would be improper because it would respond to a nonjusticiable, hypothetical controversy.

Cox represents that it "is not seeking to recover costs paid for the flushing or testing of flowlines[36] or for the costs paid for the reconnection of flowlines back to the vessels on the reconstructed platforms" and that it "is not seeking to recover costs paid for removing the structural components of Cox's [f]acilities," except in instances where the structural components had to be removed in order to access and/or remove the hydrocarbon-containing vessels and equipment.[37]  Based on Cox's response, it appears that the flowline and wreck removal costs in question involve: 1) locating and capping flowlines that were releasing hydrocarbons; 2) locating and retrieving flowlines that remained attached to vessels containing hydrocarbons, cutting them free from the vessels, and capping them to prevent the release of hydrocarbons; 3) locating and hauling up vessels and equipment that contained hydrocarbons to end the escape of hydrocarbons, and 4) removing structural components that blocked access to flowlines and hydrocarbon-containing vessels and equipment.

---

[36]    Because Cox concedes it is not seeking reimbursement from St. Paul for these expenses, the court does not address St. Paul's arguments as to why such costs are not covered.  Ultimately, each invoice will have to be reviewed to determine whether it falls within this category of expenses in part or in total.

[37]    Doc. 319, Cox's Resp. to St. Paul's Flowlines & Wreck Removal Mots., pp. 13, 14.

The court agrees with Cox that ruling on the repair of flowlines and wreck removal in the abstract is problematic.  What the court can do, as a matter of law, is to interpret the insurance policy.  St. Paul's pleadings are sufficient to raise a controversy on policy interpretation.  The court already has interpreted the control-of-property exclusion and the one-year reporting requirement and does not revisit those determinations here.  Instead, here, the court focuses on the interpretation of the general grant of coverage.

The nature of the present disputes requires that the court focus on the middle portion of the coverage grant, specifically on the definition of pollution work.  The policy covered testing for any pollutant, monitoring any pollutant, cleaning up any pollutant, removing any pollutant, containing any pollutant, treating any pollutant, detoxifying any pollutant, or neutralizing any pollutant.  It also covered the responding to, or assessing, the effects of any pollutant.

The most notable aspect of coverage is that solely actions taken related to a pollutant, either taken in response to the presence of a pollutant or taken in response to effects of a pollutant, are covered.  The words "testing," "monitoring," "cleaning up," "removing," "containing," "treating," "detoxifying," and "neutralizing" are not given special meaning in the policy and, therefore, have plain meaning.  They are simple enough vocabulary

13

terms that the court need not explain their meanings. Any cost directly incurred in the process of any of the listed actions is covered.

Notably, preventing the release of a pollutant is absent from the list of covered actions. The omission is consistent with the further requirement that the cleanup was necessitated by a sudden and accidental pollution incident. That is, pollution work was covered only if the pollutant addressed was discharged, was dispersed, escaped, or was released abruptly, immediately, unexpectedly, and unintendedly.

With regard to the indirect costs that Cox argues are covered, among them locating and retrieving flowlines and equipment that are leaking hydrocarbons, the court cannot state as a matter of law that they would be or would not be covered. Whether a particular action indirectly related to pollution work fits within coverage depends on whether, from the jury's perspective, it was so connected in purpose to one of the covered actions as to be considered pollution work itself. Each disputed cost must be evaluated, not as a matter of law, but in light of the surrounding facts to determine if it was pollution work as defined in the policy.

St. Paul advocates for the elimination of wreck removal expenses from covered costs even if the activity also abated a pollution threat. In support, St. Paul refers the court to two

opinions involving Water Quality Insurance Syndicate ("WQIS") Policies, <u>Kearny Barge Co. v. Global Ins. Co.</u>, 943 F. Supp. 441 (D.N.J. 1996), <u>aff'd</u>, 127 F.3d 1095 (3<sup>d</sup> Cir. 1997); <u>Port of Portland v. Water Quality Ins. Syndicate</u>, 796 F.2d 1188 (9th Cir. 1986). In addition to being nonbinding, these opinions are unpersuasive as discussed below.

The <u>Kearny Barge Co.</u> court held a bench trial and entered findings of facts and conclusions of law. <u>See</u> <u>Kearny Barge Co.</u>, 943 F. Supp. at 444. One of the insurance policies at issue was a WQIS policy protecting against pollution liabilities in connection with the operation of a barge. <u>Id.</u> at 452. The barge capsized and became partially submerged in shallow water. <u>Id.</u> at 447-48. The adjuster allocated a portion of the salvage bill to the WQIS policy. <u>Id.</u> at 453. The court, sitting as the fact finder, found that the refloating of the barge was a salvage operation and that the potential for pollution did not affect the salvage costs. <u>Id.</u> at 457.

The court emphasized that whether the activities were purely salvage or could be partially attributed to pollution control was a question of fact. <u>Id.</u> at 456. Finding similarities with the facts in <u>Port of Portland</u>, the court stated that, although the threat of pollution existed, "the pollution prevention resulting from the refloating of the [barge] was incidental to the salvage" efforts. <u>Id.</u> at 457-58.

15

In <u>Port of Portland</u>, the district court found on summary judgment that fuel was pumped out of a sunken dredge into tanks on the shoreline as a necessary step in salvaging the dredge. <u>Port of Portland</u>, 796 F.2d at 1195. The Ninth Circuit refused to disturb that factual finding under a clearly erroneous standard. <u>Id.</u> at 1195. The circuit court differed with the district court, however, on its finding that shoreline cleaning was a necessary part of the salvage operation also. <u>See</u> <u>id.</u> at 1195. Pier and shoreline cleaning, the Ninth Circuit explained, "is necessary in salvage operations only if there was pollution," and, thus, it would have been necessary even if the dredge had not been raised. <u>Id.</u>

Notably, the circuit court stated:

> The "facts" here are whether certain activities constituted salvage or pollution control. While there are certain historical facts (i.e., the activities taken), there remains only an ultimate factual determination categorizing those activities. There are no rules of law to apply to those facts to determine whether the activities were salvage or pollution control. The determination is a purely factual one founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct."

<u>Id.</u> at 1195 n.3 (quoting <u>United States v. McConney</u>, 728 F.2d 1195, 1202 (9th Cir. 1984), <u>overruled on other grounds</u>, <u>Estate of Merchant v. C.I.R.</u>, 947 F.2d 1390 (9th Cir. 1991)).

These cases are too far afield to offer support for St. Paul's request that this court rule, as a matter of law, that Cox's wreck removal expenses are not recoverable under the Primary and Excess Policies. Neither cited case involved the same type of policy as

16

in this case, the same coverage provision as here, or similar facts to those facing this court.  Moreover, both cases recognized that the categorization of activities as salvage or pollution control is a factual matter.

Cox places emphasis on two other terms in the coverage grant, "legally required" and "result from."[38]  However, as explained below, the former is not in issue and the latter does not alter the interpretation.

To be covered under the Excess Policy, the pollution work had to have been legally required.  As a general principle, St. Paul does not disagree that Cox was required by federal and state law to clean up pollutants in its Eloi Bay and Quarantine Bay fields.  Cox contends that federal and state statutes that required it to take certain actions in cleaning up pollution raise a fact issue on whether the expense of those actions is covered by the "legally required" language of the policies' grant of coverage.  In other words, Cox suggests that, because certain actions were required by law, those actions were covered under the policy.  But Cox's assertion that coverage extended to the bounds of its statutory and regulatory liabilities simply ignores the policy language.  That the cost be legally required was only one of several conditions for

---

[38]    Cox also argues that the policies did not contain an exclusion for wreck removal or flowline repair.  St. Paul makes no such assertion.

coverage, and nothing in the policy indicated that coverage was intended to subsume all of Cox's required pollution response.

Cox also devotes a portion of its response to the interpretation of the word "result," asserting that Texas courts give it a broad meaning with regard to causation. Be that as it may, a broad reading of "result" has no effect on the court's interpretation. Simply put, the pollution clean-up costs that resulted from the sudden and accidental "discharge, dispersal, escape, or release of a pollutant" were covered.[39] In other words, expenses for losses that were causally derivative of the pollution incident were potentially covered. Cox does not identify any damage caused by the pollutants; the damage claimed was the cost of cleaning up the pollutants themselves.

With the exception of the categories of damages Cox represents it is not seeking and expenses related to the prevention of the release of pollutants, whether the alleged costs were covered are issues of fact for trial.

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that the motions concerning flowline repair and wreck removal be **GRANTED IN PART AND DENIED IN PART.**

---

[39]    Doc. 292-8, Ex. 8 to St. Paul's Flowlines Mot., Primary Policy, p. 4.

18

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 21st day of October, 2011.

Nancy K. Johnson
United States Magistrate Judge