## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| Cox Operating, L.L.C., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action H-07-2724 |
| | § | |
| St. Paul Surplus Lines | § | |
| Insurance Company | § | |
| | § | |
| *Defendant.* | § | |

### Memorandum Opinion and Order

Pending before the Court is St. Paul Surplus Lines Insurance Company's ("St. Paul") renewed motion for judgment as a matter of law, or alternatively, motion for new trial. Dkt. 548.[1] After considering the parties' briefing, evidentiary record, and applicable law, the court is of the opinion that the motion should be DENIED.

### I. Background

Although the factual history of this case has been exhaustively set forth in numerous opinions issued by this court and the magistrate judge, the court will recapitulate the relevant facts to the extent they are necessary for the analysis of St. Paul's outstanding motion. This is an insurance coverage dispute between insured, Cox Operating, LLC ("Cox") and its insurer, St. Paul, for pollution cleanup coverage under an umbrella excess policy.

At all relevant times, Cox was the operator of certain offshore oil and gas production facilities located off the coast of Louisiana in Eloi Bay and Quarantine Bay. On August 29, 2005,

---

[1]  The court will not consider Cox's motion to strike (Dkt. 571) as it is a transparent attempt by Cox to circumvent the court's ruling imposing page limitations on Cox's response to St. Paul's motion for new trial.

Cox's facilities were damaged by the forces of Hurricane Katrina.  Production vessels and other equipment and components of Cox's facilities, including flow lines and other pipeline systems, were torn from the platforms and strewn into the surrounding waters by the hurricane.  As a result, hydrocarbons were released into the water, and Cox was required to expend significant time and money to locate, remediate, and prevent pollution at its facilities.  Specifically, Cox had to locate the sources of the pollution, cap the wells and repair flow lines, remove submerged equipment which either contained hydrocarbons or hindered Cox's ability to reach sources of pollution, and utilize booms to absorb the oil sheens.  Cox's efforts to clean up the pollution continued through the summer of 2007, and it incurred over $15 million in claimed pollution cleanup costs.

St. Paul provided insurance coverage to Cox, and its working interest owners, with respect to Eloi Bay and Quarantine Bay for pollution cleanup cost liability up to $1,000,000 per incident under a Commercial General Liability insurance policy, effective from June 1, 2005 to June 1, 2006.  St. Paul paid the limits of that policy for this claim.  St. Paul also provided an additional layer of insurance coverage to Cox over the primary policy for pollution cleanup cost liability up to $20,000,000 per incident under an Umbrella Excess Liability policy ("Excess Policy") during the same effective period.  St. Paul has paid $480,396.00 under the limits of the Excess Policy.

Cox's insurance agent notified St. Paul's broker on September 19, 2005 of the occurrence.  On October 17, 2005, Cox's insurance agent further advised St. Paul's broker via email that Cox expected a formal claim and that additional information would be forthcoming.  On October 19, 2005, St. Paul's broker was notified that Cox's pollution cleanup costs had exceeded the policy deductible.  Cox, thereafter, periodically sent invoices, photographs, and substantiation documents of the damages claimed as pollution cleanup costs under the insurance policies.  In this lawsuit, Cox

has maintained that the expenses it has submitted for coverage are valid "pollution clean-up costs" as defined in the Excess Policy and should be paid by St. Paul.  Further, Cox asserted claims under the Texas Insurance Code on the basis that St. Paul improperly handled Cox's claim from the outset.

In May 2007, St. Paul issued a reservation of rights letter, stating its view that the majority of the submitted costs were not covered under the Excess Policy without further information and support from Cox.  Specifically, St. Paul maintained that certain costs were not covered, including expenses unrelated to cleaning up or remediating pollution, those that include the assessment of fines or penalties, those that relate to first party property damage, and debris removal costs.  St. Paul contends it has already paid Cox all that it is entitled to under the policies, and in fact, overpaid for duplicate costs.  On August 23, 2007, St. Paul filed suit seeking a declaratory judgment that it was not obligated to indemnify Cox for some or all of its claimed pollution cleanup costs.  It also sent Cox a letter denying the remainder, or any amounts above the $1.47 million that St. Paul had already paid.  St. Paul cited the same reasons for non-coverage as those enumerated in the May 2007 reservation of rights letter.

A six week jury trial was held in this cause, and both parties presented significant evidence on these issues.  The jury was instructed on the parties' claims and returned a verdict in favor of Cox on June 19, 2013.  Specifically, the jury made the following findings:

1.      St. Paul failed to comply with the Excess Policy.

2.      St. Paul was required to pay Cox $9,465,103.22 under the Excess Policy, over and above amounts already paid, for pollution cleanup costs resulting from Hurricane Katrina.

3.      In regard to Cox's bad faith claim, St. Paul engaged in unfair or deceptive acts or practices which were the producing cause of actual damages to Cox:  (1) by failing to attempt in

good faith to effectuate a prompt, fair, and equitable settlement of the claim with respect to which the insurance company's liability had become reasonably clear, and (2) by refusing to pay a claim without conducting a reasonable investigation of the claim.  The jury awarded $9,400,000.00 and $62,445.26 for St. Paul's violations, respectively.

4.     St. Paul did not engage in such conduct knowingly.

5.     For purposes of Cox's claim under the Prompt Payment of Claims Act, Cox provided its Notice of Claim to St. Paul on October 17, 2005.

6.     St. Paul did not commence an investigation of Cox's claim and did not request from Cox all items, statements, and forms that St. Paul reasonably believed, at that time, would be required from Cox within 30 days of receiving the Notice of Claim.

7.     St. Paul received all items, statements, and forms required to secure final proof of loss on July 31, 2006.

8.     Cox did not fail to comply with the terms of the insurance policies by failing to cooperate with St. Paul in the investigation of the loss by failing to provide information requested by St. Paul prior to the payment date.

9.     Cox did not commit fraud against St. Paul.

## II. Legal Standard

### A.     Motion for Judgment as a Matter of Law

A judgment as a matter of law is only proper when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 248–49 (5th Cir. 2005); Fed. R. Civ. P. 50(a).  "A motion for judgment as a matter of law . . . in an action

tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Coffel v. Stryker Corp.*, 284 F.3d 625, 630 (5th Cir. 2002). Special deference must be given to the jury's verdict. *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 461 (5th Cir. 2005); *Miss. Chem. Corp. v. Dresser–Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). A verdict of a jury must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury's verdict. *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 445 (5th Cir. 2001). The evidence, as well as all reasonable inferences from it, are viewed in the light most favorable to the verdict. *See, e.g., Caboni v. Gen. Motors Corp.*, 398 F.3d 357, 359 (5th Cir. 2005); *Lane*, 241 F.3d at 445. The court disregards all evidence favorable to the moving party that the jury is not required to believe. *Perez v. Texas Dep't of Criminal Justice*, 395 F.3d 206, 215 (5th Cir. 2004).

### B.    Motion for New Trial

Rule 59 of the Federal Rules of Civil Procedure provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). A motion for new trial should be granted only if the verdict is against the great weight of the evidence or will result in a miscarriage of justice. *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838-839 (5th Cir. 2004); *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 n.3 (5th Cir. 1998). The decision whether to grant or deny a motion for new trial under Federal Rule of Civil Procedure 59(a) is within the sound discretion of the trial court. *Id.*

### III.    ANALYSIS

### A.    Coverage Under the Excess Policy

St. Paul attacks the jury's verdict on three grounds as it relates to the pollution cleanup

coverage provided under the Excess Policy.  Specifically, St. Paul asserts that Cox failed to prove that all of its expenses were covered because all of the pollution was not "sudden and accidental" as defined in the Excess Policy, and the pollution did not fully occur in the aftermath of Hurricane Katrina.

The primary objective of the court is to ascertain the parties' intent, as expressed in the written contract.  *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994);[2] *de Laurentis v. United Services Auto. Ass'n*, 162 S.W.3d 714, 721 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).  "[T]he parties' intent is governed by what they said, not by what they *intended* to say but did not."  *Nautilus Ins. Co.*, 566 F.3d at 455 (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006)) (internal quotations omitted).  The insured bears the initial burden of establishing coverage under a given policy.  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008).

In the primary policy, St. Paul agreed to pay amounts voluntarily incurred or legally required that were expended for covered pollution cleanup costs resulting from a sudden and accidental pollution incident.  The Excess Policy provided:

**Pollution clean-up costs liability**.  We'll pay amounts any protected person is legally required to pay for pollution clean-up costs that:

- are covered by this agreement; and

- would have been covered by your St. Paul Travelers Oil and Gas Commercial General Liability Basic Insurance, but aren't only because its application limit of coverage is used up.

"Pollution clean-up costs" means any cost or expense that:

---

[2]  This is a diversity case, and therefore, the court will apply Texas substantive law. *Nautilus Ins. Co. v. Country Oaks Apartments, Ltd.*, 566 F.3d 452, 454 (5th Cir. 2009).

- is for pollution work; and

- is reported to [St. Paul] within one year of the ending date of that pollution work.

"Pollution work" is defined as:

- the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing of any pollutant; or

- the responding to, or assessing, in any way the effects of any pollutant.

"Sudden and accidental pollution incident" means the discharge, dispersal, escape, or release of a pollutant that:

- is sudden and accidental;

- begins on a specific date and at a specific time while this agreement is in effect;

- is first known within 30 days of its beginning by [Cox] or any of [Cox's] employees . . .;

- any protected persons . . . attempts to and as soon as possible after it first becomes known by [Cox] or any of [Cox's] employees . . . ; and

- is reported to us within 90 days after it first becomes known to [Cox] or any of [Cox's] employees . . . .

"Sudden" means abrupt and immediate.

"Accidental" means unexpected and unintended.

The court previously held in its ruling on St. Paul's motion for partial summary judgment that the policies cover pollution cleanup costs that Cox is legally required to pay that result from a sudden and accidental pollution incident, but only if the pollution was released, discharged, dispersed or escaped in the immediate aftermath of Hurricane Katrina. *See* Dkt. 355 at 6 ("Therefore, only the clean-up efforts related to the hydrocarbons that were discharged, were dispersed, were released, or

7

escaped in the immediate aftermath of Hurricane Katrina are covered under the St. Paul policies."). Specifically, the court held that expenses for the following are covered:

    a.    Testing, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing pollutants that were released, discharged or escaped in the immediate aftermath of Katrina.

    b.    Removal of structural components that blocked access to equipment if necessary to abate pollution in the immediate aftermath of Katrina, but not if the components had to be removed anyway and removal happened to make pollution abatement more convenient.

*Id.* Conversely, the court held that the policies did not cover costs for pollution prevention or to clean up pollution resulting from cutting flow lines that were not actively polluting. *Id.* at 7. Also, except as noted above, the policies were held not to cover:

    a.    Costs to clean up subsequent pollution discharges that result from the cleanup efforts.

    b.    Actions taken for the purposes of repairing flowlines.

    c.    Actions taken relating to any vessels and equipment that is not polluting (even if submerged and containing hydrocarbons).

*Id.* The jury instructions not only contained the express policy language, but also included the previous findings of law by this court as to what expenses were and were not covered, as outlined above. Dkt. 485.

### i.    Sudden Pollution Incident

St. Paul asserts that Cox failed to prove that the costs it incurred resulted from a sudden pollution incident. Rather, St. Paul argues the pollution was gradual and continuous or not released

in an abrupt or immediate manner as required by the Excess Policy.  It is undisputed that the damage caused by Hurricane Katrina was sudden and accidental.  However, St. Paul disagrees that the extent of the pollution occurred suddenly and within a discrete period of time in the aftermath of the hurricane.  St. Paul relies on the testimony of certain witnesses who testified that the pollution continued over months and years during the cleanup and rebuilding efforts at Cox's facilities as equipment was moved and removed from the site.

St. Paul, however, incorrectly focuses on the residual pollution that continued to take place after the sudden and accidental discharge of pollutants caused by Hurricane Katrina.  It is the initial discharge, and not the resulting environmental effect, that must be sudden.  *See Am. States Ins. Co. v. Hanson Indus.*, 873 F. Supp. 17, 25 (S.D. Tex. 1995) (collecting cases addressing meaning of "sudden" in pollution exclusion cases); *In re Tex. E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 870 F. Supp. 1293, 1347 (E.D. Pa. 1992) (applying Texas law and concluding that the discharge of the PCBs, and not the resulting environmental damage, must be both "sudden and accidental" in order for the exception to the pollution exclusion to apply).  Likewise, courts in other jurisdictions have all been virtually unanimous in concluding that the focus of the sudden pollution inquiry is on the initial discharge of the pollutant into the environment, not the resulting discharge. For example, the Third Circuit recently concluded that "the plain language of the 'sudden and accidental' exception focuses on the nature of the discharge, not on the resulting environmental damage." *New Castle Cnty. v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1202 (3rd Cir. 1991) (Delaware law), *abrogated by N. Ins. Co. of N.Y. v. Aardvark Associates, Inc.*, 942 F.2d 189 (3rd Cir. 1991) (Pennsylvania law); *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1157 (4th

Cir. 1992) (New Jersey law); *Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 954 F.2d 601, 607 (10th Cir. 1992) (Colorado law).

Additionally, courts have held that a temporal element is encompassed in the term "sudden," which is consistent with the policy language in this case defining "sudden" as "abrupt and immediate." *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 554-55 (5th Cir. 2004) (under Texas law, the "sudden and accidental" clause contains a temporal element in addition to the requirement of being unforeseen or unexpected). While St. Paul seeks to append language to the policy by arguing that the pollution must have a discrete beginning and end, the "sudden" element only requires that the actual discharge be abrupt and immediate and begin on a specific date during the policy period. *See Pioneer Chlor Alkali Co., Inc. v. Royal Indem. Co.*, 879 S.W.2d 920, 937-38 (Tex. App.–Houston [14th Dist.] 1994, no writ) (refusing to insert a qualifying phrase into the meaning of "accident" when insurer failed to do so).   In this case, while pollution continued to be discovered during the cleanup efforts, the release of the pollution did abruptly and immediately occur when Hurricane Katrina demolished Cox's facilities.  New discoveries of pollution may have occurred after August 29, 2005, but only as a result of removing and disturbing the remnants of Cox's equipment containing hydrocarbons that lay beneath the surface of the water in a state of destruction resulting from the hurricane.  Although the pollution, or full extent of the pollution, may not have been visible or witnessed until the equipment was moved or removed does not negate the fact that the pollution occurred as a result of the force of the hurricane.

St. Paul's reliance on cases such as *Mesa Operating* and *Gulf Metals* is misplaced.  *See Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749 (Tex. App.–Dallas 1999, pet. denied); *Gulf Metals Indus., Inc. v. Chic. Ins. Co.*, 993 S.W.2d 800 (Tex. App.–Austin 1999, pet. denied).  The

pollution incidents that occurred in those cases were the result of slow, continuous leaks (or intentional spilling) that were not discovered for long periods of time. Specifically, in *Mesa Operating*, corrosion to a well casing caused salt water to escape into a fresh water aquifer. *Mesa Operating*, 986 S.W.2d at 754. And, in *Gulf Metals*, zinc was leaked into the groundwater from storage containers. *Gulf Metals*, 993 S.W.2d at 803. Both courts concluded that the term "sudden" included a temporal component and required the pollution to occur in a quick or abrupt manner. *Id.*; *Mesa*, 986 S.W.2d at 757. Neither court found that the slow, continuous leaks at issue in those cases constituted a sudden occurrence. *Ibid.*

The *Mesa* court, however, acknowledged that if, for example, a container burst, releasing a finite amount of pollution into the surrounding area within a short period of time, the discharge could be considered sudden. *Mesa*, 986 S.W.2d at 757. Analogously, the pollution in this case was abruptly released into the environment when Hurricane Katrina hit the Cox facilities, but was not necessarily discovered all at once given the extent of the damage and the area in which the pollution was released. There were not multiple pollution incidents that led to additional releases, but rather Hurricane Katrina caused the damage resulting in one pollution incident, which only took a longer time to discover and cleanup. Thus, the court cannot say as a matter of law that the pollution costs incurred by Cox were not the result of a sudden and accidental pollution incident in the immediate aftermath of Hurricane Katrina as defined by the Excess Policy.

In light of the parameters defined by this court and the language of the Excess Policy, the determination of whether costs were for pollution work, as opposed to salvage and rebuilding operations or pollution prevention, was a fact question for the jury. *See Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1195 n.3 (9th Cir. 1986) ("The facts here are whether certain

activities constituted salvage or pollution control.  While there are certain historical facts (i.e., the activities taken), there remains only an ultimate factual determination categorizing those activities. There are no rules of law to apply to those facts to determine whether the activities were salvage or pollution control.  The determination is a purely factual one founded on the application of the fact-finding tribunal's experience with the mainsprings of human conduct.") (internal quotations omitted).

And, the jury had significant evidence regarding Cox's cleanup efforts following the hurricane.  Tim Morrison, Cox's Vice President of Operations, began working for Cox on the day the hurricane struck.  Morrison's role following the hurricane and his background as a chemical engineer made him uniquely qualified to discuss Cox's operations and the impact the hurricane had on such operations.  He was directly involved in the recovery operations from the outset and was integral to the cleanup and rebuilding efforts, as well as the collection and assessment of invoices and claim support documentation.  Morrison was frequently on-site throughout the cleanup process. He testified about the extensive devastation at Eloi and Quarantine Bays, the significant logistical obstacles in securing services and supplies during the time following the hurricane, and the extensive operations to contain and cleanup the pollution, remove debris and equipment, and rebuild the facilities.

Morrison specifically described the destruction caused by Hurricane Katrina.  He described Cox's efforts to locate the sources of pollution in the flow lines, run absorbent boom to remove the oil sheens, and dispose of the pollutants.  He specifically described the tasks of the various vendors and  how such tasks constituted pollution work based on the definitions in the Excess Policy.  The jury heard how Cox classified its expenses and operations.  It heard which tasks Cox considered

pollution and those which were considered salvage or construction.  The jury rendered a reasonable verdict based on the evidence it had to make its determination as to whether Cox's claimed costs constituted pollution cleanup costs under the terms of the Excess Policy and as limited by the court's previous rulings.

### ii.    Segregation

St. Paul also asserts that Cox failed to meet its burden segregating covered expenses from non-covered expenses.  Under Texas law, the insured bears the burden of proving that a loss is covered under the terms of the insurance policy.  *Fiess v. State Farm Lloyds*, 392 F.3d 802, 807 (5th Cir. 2004).  If covered and non-covered perils combine to create a loss, the insured may only recover the amount caused by the covered peril.  *Id.*  Because the insured may only recover for covered losses, it bears the burden of presenting evidence that will allow the trier of fact to segregate covered losses from non-covered losses.  *Id.*  The segregation does not have to be done with "absolute mathematical precision," but must provide a "reasonable basis upon which a jury could reasonably allocate damages" between concurrent causes.  *Id.* at 808 n. 24.

Cox presented sufficient evidence in order to allow the jury a reasonable basis to segregate covered and non-covered expenses.  For example, Morrison testified regarding the individual invoices and vendors which were segregated between pollution, construction, salvage, or other types work.  He performed an invoice-by-invoice analysis of the entire pollution claim, and given his personal knowledge of the operations and cleanup efforts, he was in a reliable position to evaluate whether costs were pollution-related or not.  The invoices were broken down between pure pollution costs and those that only accounted for a portion of pollution work.  Many invoices were submitted for only partial payment based on the portion of the invoice attributable only to pollution work.

Morrison identified the type of work and projects which Cox classified as pollution work and those that it did not, such as salvage removal operations which were not classified as pollution work, but rather as construction work.  Further, Morrison itemized several other operations that were not classified as pollution work by Cox for its claim.  Thus, the jury had a reasonable basis by which to render a verdict for costs only claimed under the covered peril.

**B.      Double Recovery**

**i.      Working Interest Owners**

St. Paul argues that Cox has not suffered a legal loss because its working interest owners paid the pollution cleanup costs in proportion to their ownership interests.  Cox was the operator of Quarantine and Eloi Bays, while several working interest entities or individuals owned a percentage of the lease on the fields and the revenue streams therefrom.  Cox does not dispute that the working interest owners provided the money to pay the pollution cleanup costs.  However, Cox has also presented evidence that it must reimburse the owners from the insurance proceeds recovered in this matter.

The insurance issued by St. Paul listed Cox as the sole named insured, and in that capacity, gave Cox the right to sue St. Paul for breach of the insuring agreements.  Consistent with its obligations to the working interest owners, Cox purchased an "Additional Protected Persons Endorsement" for its oil and gas nonoperating working interests.  This endorsement provided the same coverage for the working interest owners for any covered pollution cleanup costs as was provided to Cox.  When Cox filed its second amended counterclaims against St. Paul, it brought suit in its name and on behalf of the working interest owners.  This arrangement between Cox and the

working interest owners and the concomitant obligations of St. Paul under the insuring agreements does not support St. Paul's position that Cox did not suffer a legal loss.

St. Paul's reliance on *Gotham* for the proposition that Cox has not suffered a legal loss based on payments by the working interest owners falters by the reasoning in *Home Owners*. *Compare Gotham Ins. Co. v. Petroleum Dev. Corp.*, 2003 WL 21696625 (Tex. App.–San Antonio 2003, pet. denied) *with Home Owners Mgmt. Enterprises, Inc. v. Mid-Continent Cas. Co.*, 294 Fed. Appx. 814 (5th Cir. 2008). In *Gotham*, the court found that the under an indemnity well control policy, the operator could not recover because it had not suffered a "legal loss" when the working interest owners paid the well blowout costs without reimbursement. *Gotham*, 2003 WL 21696625, at *3. *Gotham*'s ruling was expressly confined to indemnity policies wherein the working interest owner was not reimbursed by the operator/insured.

In *Home Owners*, insurer issued a commercial general liability policy to a homebuilder whereby the insurer would "pay those sums that the insured becomes legally obligated to pay as damages." *Home Owners*, 294 Fed. Appx. at 818 n. 14. The homebuilder sold a home under a sales contract, which included a warranty requiring the warranty company to perform any warranty obligations unfulfilled by the homebuilder. *Id.* at 815. The homebuilder was required to reimburse the warranty company for any out-of-pocket expenses for payments made under the warranty. *Id.* The home buyers subsequently recovered a judgment against the homebuilder and warranty company for construction defects to their home. *Id.* The warranty company paid the damages, but the commercial general liability insurer refused to defend or indemnify the homebuilder for the judgment. *Id.* at 816.

15

In a subsequent coverage action, the insurer argued the homebuilder did not suffer a legal loss because the warranty company paid the judgment. *Id.* at 818. Noting that the warranty company was not the homebuilder's insurer and that the homebuilder was obligated to reimburse the warranty company for the amounts expended on its behalf, the Fifth Circuit ruled that the insurer was still liable on the policy for covered occurrences. *Id.* at 819. Payment of the homebuilder's judgment by the warranty company did not alter the homebuilder's legal responsibility for the damages as contemplated by the liability policy, and did not absolve the insurer of its obligations thereunder. *Id.*

Like the arguments made in *Gotham* and *Home Owners*, St. Paul contends that Cox has not suffered a legal loss because the working interest owners paid the pollution cleanup costs. However, in all significant respects the instant dispute is analogous to *Home Owners* and distinguishable from *Gotham*. In *Home Owners*, the insurance policy was a liability policy under which the insurer was required to pay amounts that the insured became "legally obligated to pay," whereas *Gotham* specifically addressed indemnity policies. The instant case involves a liability policy in which St. Paul agreed to pay those sums any protected person is "legally required to pay." Thus, St. Paul's obligation to pay is triggered when Cox becomes legally liable for the cost or expense, not when it pays the cost or expense, *see id.* at 817 (distinguishing indemnity from liability policies), and the payments by the working interest owners do not extinguish St. Paul's obligations to Cox under the Excess Policy.

Like the homebuilder in *Home Owners* and unlike the operator in *Gotham*, the evidence also establishes that Cox is required to reimburse working interest owners from any proceeds recovered in this action. Brad Cox, President of Cox Operating LLC, testified that the money spent on the

pollution cleanup costs originated from working interest owners.  And, money paid by St. Paul on the pollution claim was paid back to the working interest owners.  Additionally, any money recovered in this lawsuit would pass through to working interest owners. Therefore, Cox is legally entitled to recover under the Excess Policy issued to it by St. Paul and on behalf of the working interest owners as additional protected persons.

Further, while St. Paul does not frame its objection to Cox's ability to recover in terms of Cox's status as the real party in interest, the crux of its argument is that Cox is not the proper party to recover because the working interest owners paid for the pollution cleanup.  St. Paul, however, has waived its right to assert that the working interest owners are the real parties in interest at this late juncture in the case.  St. Paul has been on notice that the working interest owners were interested parties since Cox filed its second amended counterclaim in July 2008, making claims against St. Paul in its name and on the behalf of the working interest owners.  Dkt. 77.

Rule 17 of the Federal Rules of Civil Procedure governs proper parties and requires that "[a]n action must be prosecuted in the name of the real party in interest."  FED. R. CIV. P. 17(a)(1).  The real party in interest is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery."  *In re Signal Int'l, LLC*, 579 F.3d 478, 487 (5th Cir. 2009) (citing *Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990)).  The purpose of this requirement "is to assure a defendant that a judgment will be final and that res judicata will protect it from having to twice defend an action, once against an ultimate beneficiary of a right and then against the actual holder of the substantive right."  *Id.*

Although an action must be prosecuted by the real party in interest, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an

objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." FED. R. CIV. P. 17(a)(3). This provision requires the defendant to object in a timely manner in order to allow the opportunity for joinder of the ostensible real party in interest; however, the defense may be waived if the defendant does not timely object. *Signal*, 579 F.3d at 487-88. The defendant timely objects as long as the joinder of the real party in interest remains "practical and convenient." *Id.*

In an exoneration and limitation of liability case, a similar argument was made by the unsuccessful party following trial. *Id.* Signal, the barge owner, objected to the Mississippi Department of Transportation's ("MDOT") recovery when its barges broke from their moorings and allided with a bridge, which was owned by the federal government but operated by MDOT. *Id.* at 484. The barge owners argued that MDOT did not suffer a loss because the costs to repair the bridge were reimbursed by the federal government. *Id.* at 487. The court held the objection to MDOT's status as the real party in interest was untimely and waived when first presented in the joint pretrial order on the eve of trial, despite the barge owner's knowledge of the circumstances surrounding MDOT's reimbursement by the federal government. *Id.* at 489.

Like the barge owners in *Signal*, if St. Paul believed that the working interest owners were the real parties in interest and should be joined in the lawsuit, it failed to timely object. St. Paul cannot attempt to challenge Cox's recovery on the basis that the working interest owners are the true parties suffering a loss in this case after trial. The role of working interest owners has been known to St. Paul since at least July 2008, and any objection to Cox as the proper party in interest is waived.

### ii.    Other Insurance Payments

The court has previously ruled in its order addressing St. Paul's motion to alter or amend

18

judgment that the evidence does not support St. Paul's position that Cox has or will receive a double recovery based on the payments received by other insurers from Cox's removal of wreckage and debris or property claims.  Dkt. 583.  The court will not restate its ruling here and finds no reason to disturb the jury's verdict or rule, as a matter of law, that Cox has or will be reimbursed twice for the same pollution cleanup costs represented in the jury's award.

### C.    One Year Reporting Provision

St. Paul reurges its position that the jury award should be reduced by at least $2,089,610 because Cox failed to comply with a condition precedent to coverage by failing to report its cleanup costs within one year of the completion of the pollution work.  St. Paul asserts that the one year reporting requirement is part of the insuring provision, and therefore, cannot be waived.  The court previously ruled that the one year reporting requirement is an unambiguous condition precedent to coverage that is not evaluated with reference to the individual invoice date.  Dkt. 216.  The court maintains that the language in the Excess Policy does not support St. Paul's position, and if St. Paul intended for the policy to limit the insured to those losses reported within one year of the invoice date, it could have included language to that effect.

However, notwithstanding the proper accrual date of the one year reporting requirement, St. Paul waived any non-compliance by Cox of this condition to coverage.  Compliance with a notice provision is a condition precedent, the breach of which voids policy coverage.  *Stonewall Ins. Co. v. Modern Exploration, Inc.*, 757 S.W.2d 432, 435 (Tex. App.–Dallas 1988, no writ).  The provisions of an insurance policy regarding an insured's duties after a loss are for the benefit of the insurer, and therefore, the insurer can waive these conditions.  *Sanders v. Aetna Life Ins. Co.*, 205 S.W.2d 43, 44–45 (Tex. 1947); *Stonewall*, 757 S.W.2d at 435.  An insurer's denial of a claim before the deadline

for presenting the required proof of loss (or other documentation) waives that requirement. *Sanders*, 205 S.W.2d at 45 (finding that, because the insurer denied the claim before the deadline to submit proofs of continued total and permanent disability, the insurer waived that requirement because nothing occurred after the denial that "would indicate to [the insured] that the submission of further proofs of loss would be more than an idle formality"); *see also North River Ins. Co. v. Pomerantz*, 492 S.W.2d 312, 313 (Tex. App.–Houston [14th Dist.] 1973, writ refused n.r.e.) (stating that "[a] denial of liability by the insurance company within the period allowed for filing proof of loss, on grounds other than the failure to submit proof of loss, constitutes waiver of this requirement"); *Stonewall*, 757 S.W.2d at 436.  Conversely, a total denial of liability on any grounds *after* the time limit for giving notice would not constitute a waiver.  *Id.* (citing *United States Fid. & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971)).

Waiver of a condition precedent is evaluated according to what the insured reasonably believed under the circumstances.  *De Laurentis v. United Services Automobile Assoc.*, 162 S.W.3d 714, 720 (Tex. App.–Houston [14th Dist.] 2005, pet. denied).  If a reasonable policyholder would have considered compliance with the requirement futile, waiver has occurred.  *Id.* at 721;  *North River Ins. Co.*, 492 S.W.2d at 314.  It is enough that the actions of the insurance company would reasonably lead the insured to believe that the company is not going to pay the claim because of some reason other than failure to file the required proof of loss.  *Id.* (finding it is of no consequence "whether the insurance company informs the insured that the claim absolutely will not be paid or simply indicates that it is not planning to pay the claim unless some new development arises"); *De Laurentis*, 162 S.W.3d at 720.

Brad Cox believed, as of the issuance of the May 2007 reservation of rights letter, that St. Paul was denying its claim for pollution cleanup costs. While the May letter did not fully deny the claim, correspondence from St. Paul's counsel in late August 2007 unequivocally denied the remainder of the claim. Out of approximately $15 million paid for pollution cleanup costs submitted by Cox, St. Paul paid out approximately $1.47 million. Neither the reservation of rights letter, nor the August 2007 denial letter, cited the one year reporting provision as a ground for denial despite internal discussions among St. Paul and its adjusters regarding this condition. Ellis testified he did not warn or notify Cox regarding the one year reporting requirement. St. Paul's total denial of Cox's claim on other grounds prior to the expiration of the one year reporting deadline constituted a waiver of this condition to coverage.

St. Paul relies exclusively on cases involving initial notice provisions for its position that such conditions to coverage cannot be waived. The court, however, distinguishes the initial notice provision triggering coverage as relied on by St. Paul, which arguably cannot be waived, from a provision like the one year reporting requirement that serves to aggregate the amount of the claim. Generally, a failure to give timely notice is a breach of the insurance contract and relieves the insurer of its obligation to defend or indemnify. *Am. States Ins. Co. v. Hanson Indus.*, 873 F. Supp. 17, 28 (S.D. Tex. 1995) (collecting cases). The purpose of the notice requirement is to enable the insurer to promptly investigate the circumstances of the accident while the matter is fresh in the minds of the witnesses, to prevent fraud, and to enable it to form an intelligent estimate of its rights and liabilities under the policy so that it may adequately prepare to defend any claim that may arise. *Stonewall*, 757 S.W.2d at 435. On the other hand, the one year reporting requirement is an additional obligation of the insured after the initial notice triggering coverage which serves to inform

21

the insurer of the amount of the claim.  *De Laurentis*, 162 S.W.3d at 720; *St. Paul Surplus Lines Ins.*

*Co. v. Davis Gulf Coast, Inc.*, 2012 WL 2160445, *4 (S.D. Tex. June 13, 2012) (contrasting the

notice provision which triggers coverage with the one year reporting requirement under which the

insured must report the amount of the claimed expenses).

While the parties have not cited to any cases which involve the waiver of this specific one

year reporting provision, the case in *De Laurentis* presents the closest factually analogous situation.

*De Laurentis* most closely parallels the instant case because it did not involve a notice of claim

provision triggering coverage, but rather involved a subsequent reporting duty necessary to determine

the amount of the loss.  In *De Laurentis*, the insurer argued that the insurance policy was void

because the insured failed to comply with a condition precedent by failing to submit a written

inventory of damaged personal property.  *Id.* at 719.  The court concluded the insurer waived the

requirement for the written inventory when it informed the insured that her claim was not covered

for other separate reasons.  *Id.* at 720-21.  Because the condition precedent was waived, the insured

was not barred from recovery in a suit for breach of the insurance contract.  *Id.*

Despite the rulings relied upon by St. Paul relating to initial notice provisions, the court finds

that the initial notice provision is distinct from this separate reporting obligation of Cox and can be

waived.  These two types of reporting provisions serve different functions and cannot be equated in

terms of the bargained-for exchanges discussed in the specific cases cited by St. Paul.[3]  Because St.

---

[3] Further, St. Paul has not demonstrated that it suffered prejudice by Cox's alleged failure to notify
St. Paul within one year after the completion of the pollution work.  *See Int'l Ins. Co. v. RSR Corp.*, 148 Fed.
Appx. 226, 231-32 (5th Cir. 2005) (finding that a breach by the insured of a provision which is not the notice
provision triggering coverage does not excuse an insurer of performance without a showing by the insurer
that it was prejudiced by such breach).

22

Paul denied Cox's claim on other grounds before the one year reporting requirement deadline, St. Paul waived such condition.

### D.      Prompt Payment Claim Act Violations

St. Paul maintains that there was insufficient evidence supporting the jury's findings regarding violations by St. Paul of the Texas Prompt Payment of Claims Act ("TPPCA"). First, St. Paul claims that the evidence contradicts the jury's finding that St. Paul received all information it needed to secure final proof of loss by July 31, 2006. St. Paul also asserts that there is insufficient evidence to support the jury's finding that it violated the TPPCA with respect to commencing an investigation and requesting documents from Cox within 30 days of receiving notice of the claim.

The TPPCA imposes requirements on an insurer with respect to responding to claims, accepting or rejecting claims, and promptly paying accepted claims. TEX. INS. CODE § 542.051, *et seq.*; *Guideone Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 830 (Tex. App.–Forth Worth 2008, no pet.). To successfully maintain a claim under the TPPCA, an insured must establish: (1) a claim under an insurance policy; (2) that the insurer is liable for the claim; and (3) that the insurer has failed to follow one or more sections of the TPPCA with respect to the claim. *Id.* at 830-31.

St. Paul disputes the third element with respect to Section 542.055 of the TPPCA. Specifically, Section 542.055 requires that not later than the 30th business day[4] after the date the insurer receives notice of a claim, "the insurer shall: (1) acknowledge receipt of the claim; (2)

---

[4]   Eligible surplus lines insurers are given 30 business days, as opposed to 15 business days for general insurers, to acknowledge receipt of the claim, commence an investigation, and request documents after notice of the claim. TEX. INS. CODE § 542.055(a). Neither party disputes that St. Paul is an eligible surplus lines insurer.

commence any investigation of the claim; and (3) request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant." TEX. INS. CODE § 542.055.  The jury found that Cox provided St. Paul notice of its claim on October 17, 2005, and that St. Paul failed to commence an investigation and request documentation from Cox within 30 days of receiving notice of Cox's claim.

St. Paul argues there is insufficient evidence to support the jury's finding on this issue.  A review of the record, however, shows overwhelming evidence supporting the jury's conclusion that St. Paul violated Section 542.055.  Randy Keiser of Shuman Consulting originally handled the Cox pollution claim adjustment on behalf of St. Paul.  While Keiser attempted to set up a meeting with personnel at Brammer Engineering, the company managing operations at the Eloi and Quarantine Bays on behalf of Cox, he could not recall ever specifically requesting documentation from Cox or any of its agents.  Further, there were no notations in his file reflecting such requests.  After the meeting was cancelled for November 4, 2005, Keiser did not initiate contact with Cox again until February 2006.  Keiser further admitted he was not hired to investigate the claim, only to adjust it by solely reviewing documents.  Neither adjuster nor anyone on St. Paul's behalf visited Eloi or Quarantine Bays during the primary pollution cleanup period or prior to July 2007.  In fact, the first documented request for information occurred in July 2006 when Ron Ellis of Shuman Consulting took over the claim.  Specifically, Ellis requested itemized invoices and support documentation.  Brad Cox, President of Cox Operating, LLC, also testified that he did not receive a request for information from St. Paul or its adjusters prior to July 25, 2006.  The evidence clearly supports the jury's finding that St. Paul violated Section 542.055 of the TPPCA.

St. Paul's contention that evidence conflicted with the jury's finding in Question No. 8 that St. Paul had received all items, statements, and forms required to secure final proof of loss on July 31, 2006 is equally without merit.  The court included that question in the jury verdict form as it related to specific potential violations of the TPPCA and tracked the statutory language for each enumerated violation of the TPPCA.  The question was included in order to account for each possible statutory violation in the event the jury found that St. Paul had not violated previous statutory provisions.  While the court does not necessarily agree that the evidence contradicts the jury's verdict to Question No. 8, addressing such evidence would be an exercise in futility.  The jury found in Question No. 7 that St. Paul had violated the first possible statutory claims-handling requirement under the TPPCA, making the finding in Question No. 8 irrelevant.  Since the jury determined that St. Paul violated an earlier provision of the statute, the jury's finding on this question has no effect on the outcome of the case.

### E.      Improper Submission of Bad Faith Claim

St. Paul submits that the court erred by improperly submitting the jury questions with regard to Cox's bad faith claim under Chapter 541 of the Texas Insurance Code.  The court previously ruled that Cox's claim for bad faith against St. Paul could not stand because Cox had suffered no damages independent of the amounts it claimed were due and owing under the insurance policy.  Dkt. 419.  However, given the evidence and the conflicting jurisprudence in this area of the law, the court erred on the side of caution by submitting the claim to the jury in the event the Fifth Circuit should disagree with this court's ruling and in order to prevent a retrial on this issue.  While the court decided to submit the issue to the jury, the resulting verdict and election of remedies by Cox rendered the submission meaningless.  The jury found that St. Paul did not violate Chapter 541 of

the Texas Insurance Code knowingly, so Cox elected its remedy under the TPPCA.  The Fifth Circuit has held even if the jury instructions were erroneous, a reversal is not warranted if the challenged instruction does not affect the outcome of the case.  *J. Lee Milligan, Inc. v. CIC Frontier, Inc.*, 289 Fed. Appx. 786, 791 (5th Cir. 2008) (citing *Johnson v. Sawyer*, 120 F.3d 1307, 1315 (5th Cir. 1997)).  In light of the entire record, the court will not grant a new trial on the basis of the submission to the jury of Cox's bad faith claim.

### F.      Improper Use of Demonstrative

St. Paul further requests a new trial on the basis of a demonstrative piece of pipe used by Cox during the course of the trial.  St. Paul argues the pipe was irrelevant to issues in the case and prejudicial.   District courts have significant discretion to determine whether a particular demonstrative aid will indeed be helpful or cause confusion or prejudice. *Barnes v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977) (applying FED. R. EVID. 401 & 403 to demonstrative evidence).  Demonstrative aids may be used at trial to assist the jury in understanding the evidence presented, but may not themselves be admitted as exhibits.  *United States v. Buck*, 324 F.3d 786, 791 (5th Cir. 2003) ("It was proper for the diagram to be shown to the jury to assist in its understanding of testimony and documents that had been produced, but the diagram should not have been admitted as an exhibit or taken to the jury room.").  In this case, the demonstrative pipe was useful for the jury to see the type of pipe and hydrocarbons causing the pollution following the hurricane.  The trial court refused to allow the pipe to go back to the jury room as an exhibit and reiterated to the jury that the pipe was not evidence.  The jury charge instructed the jury that it should decide the case on the evidence.  Therefore, the court does not find that Cox's use of the demonstrative pipe was irrelevant or prejudicial or warrants a new trial.

### G.     Inconsistent Verdict

Finally, St. Paul seeks a new trial because it claims the jury verdict is inconsistent. Specifically, St. Paul claims the total amount of the jury award for amounts owed by St. Paul under the Excess Policy, over and above the amounts already paid, for pollution cleanup costs includes amounts that were submitted to St. Paul after July 31, 2006, the date the jury found that St. Paul "receive[d] all items, statements, and forms required to secure final proof of loss."  Dkt. 489.

In the Fifth Circuit, the court has a duty to attempt to reconcile a jury's apparently inconsistent verdict, if possible, in order to validate the jury's verdict.  *Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 670 (5th Cir. 2002).  In reconciling an apparent conflict, the court must determine whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted."  *White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir. 1987) (quoting *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973)).

Relevant to St. Paul's argument, the jury charge instructed as follows:

St. Paul failed to timely pay all or part of Cox Operating's claim if St. Paul failed to pay the amount of Cox Operating's claim that St. Paul owed under the Excess Policy within 60 days after St. Paul received all of:

> a.      the items, statements, and forms required by St. Paul to secure final proof of loss; and
>
> b.      the items, statements, and forms requested by St. Paul that St. Paul reasonably believed, at the time, would be required from Cox Operating.

The phrase "all items, statements, and forms required by St. Paul to secure final proof of loss" means that St. Paul must receive all materials needed by St. Paul to put a value on the covered portion of the loss claimed by Cox Operating.

Dkt. 485 at 12.  Question 8 in the verdict form, for purposes of the TPPCA, asked "on what date did St. Paul receive all items, statements, and forms required to secure final proof of loss?" to which the jury answered July 31, 2006.  Dkt. 489.

As discussed *supra*, Question 8 of the verdict form had no bearing on the outcome of the case because the jury found that St. Paul violated earlier requirements of the TPPCA.  Additionally, St. Paul's argument fails to take into account the jury instructions relating to the TPPCA that state St. Paul fails to make timely payment if it does not pay within 60 days after receiving all of the documents to secure final proof of loss *and* the document requested by St. Paul.  As the jury determined in Question 7 of the verdict form, St. Paul did not timely request documents from Cox as required by the TPPCA.  Because the jury found St. Paul had already violated the TPPCA by not requesting the documents it needed from Cox, the jury verdict is not inconsistent.

## IV.  CONCLUSION

For the foregoing reasons, the court does not find that the jury's verdict should be disturbed. Therefore, St. Paul's renewed motion for judgment as a matter of law, or alternatively, motion for new trial (Dkt. 548) is DENIED.

It is so ORDERED.

Signed at Houston, Texas on February 7, 2014.

_____
Gray H. Miller
United States District Judge

28